So we'll begin with 20-419 Butler v. ProShares Trust. Mr. Hubachek? Yes, Your Honor. Good afternoon, Your Honors. Steve Hubachek on behalf of the plaintiff's appellants. Your Honors, the issue that I plan to address this morning is the basis for the warnings contained in the registration statement and defendant's various statements actually addressed the omission that we've been challenging. Now, with respect to the omission, Your Honors, that is that the fund's own conduct of rebalancing in an overly crowded VIX futures market could itself drive up the price of VIX futures contracts, the level of market volatility, and the level of the VIX short-term futures index, which would have the effect of driving down the value of the SVXY shares that our clients have purchased. Now, using the language from this court's decision in Halpern, while defendants disclosed the possible adverse effects of the illiquid markets, their disclosures did not expressly warn of or did not directly relate to the risk that brought about our client's loss, which is basically that SVX's own trading could bring about a liquidity gap. Now, this court's decisions in Halpern and Hunt, I guess, provide a prism through which this court can view this case. In Halpern, the question was whether or not the investors had been adequately advised of the fact that the shares in that case might never be registered, and this court found, in fact, that they had because, at most, the registration statement said that the company intended to endeavor to register the shares. So, it was clear that shares weren't registered, and this court concluded that, indeed, they may never well be registered. Now, Hunt was in an entirely different situation where there was the possibility of an against potential losses in the fund's investments in foreign currency, but what was not disclosed was that, in fact, seeking out those hedging contracts was so expensive that it could never be done. So, the relevant risk in that case that wasn't disclosed was the inability to purchase the futures contracts at a cost-effective price. Well, here we have the same situation where the disclosures regarding the ill effects of illiquid markets did not advise investors of the distinct possibility that SVXY's own trading could, in fact, cause illiquid markets. So, it's the difference between the potential effects of illiquid markets versus the actual and that's exactly what was omitted here. Now, the district court found that that particular risk was disclosed, and this is at page 135 of the joint appendix, in a portion of the registration statement that said that possible illiquid markets may exacerbate losses, and that's actually the causes of possible illiquid markets, and the text of the disclosure that follows that particular heading is to the same effect. The second paragraph begins with a statement that market illiquidity may cause losses for the funds, and again, we're still on page 135 of the joint appendix. Well, that's, again, a cause. The effects of the illiquid markets, not the cause. Now, the next sentence says the large size of the positions which the funds may acquire increases the risk of illiquidity by both making their positions more difficult to liquidate and increasing the losses incurred while trying to do so. Now, that sentence does not unambiguously indicate that the trading or even ambiguously indicate that the trading that was going to undertaken by the fund could actually cause market illiquidity. It explicitly addresses what will happen in the event of market illiquidity, i.e., that the positions will be more difficult to liquidate and losses will be increased while trying to liquidate those positions. So, taken as a whole, including both the heading to the section and the topic sentence for the paragraph in which that sentence appears, it's clear that it's addressing not the potential for the fund's own trading to cause market illiquidity, but in fact, what might happen in the event that market illiquidity occurs for any reason. Now, the defendants have suggested that particularly with respect to the section 11 claim that we have relied upon facts to demonstrate the significance of this risk that occurred after the registration statement became effective, which was in July of 2017, and that's not the case. At paragraphs 55 to 58, we alleged that the volatility was extremely low and that billions of dollars were flowing into these exchange-traded products at the time, even before the registration statement became effective. Similarly, at paragraph 124 and paragraph 61 of the complaint, we alleged that SVXY subscriptions increased over 50% if you compare May 31st of 2017, which is prior to, of course, the effective date of the registration statement, and July 31st of 2016. Similarly, over the year from 12-31-16 to 12-31-17, the fund's assets increased 257%. Now, I understand that that pleading stage, it supports an inference that as of the time that the registration statement became effective, there had been substantial increase in the fund's assets. So, the actual growth of the fund was well established by the time that the registration statement was filed. Similarly, we also demonstrated through a hypothetical four-point increase that in 2013, such an increase would require 20,000 futures contracts to resolve and rebalance, whereas by June of 2017, again, prior to the registration statement, resolving that same four-point increase would require 88,000. And in fact, just in the year of that would have been required in January of 2017. So, clearly, by the time the registration statement became effective, the fund was growing at an extraordinary rate. But at the same time... You have a minute left. All right. Thank you. But at the same time, the supply of futures contracts was lagging, and that's addressed at paragraph 87 of the complaint, where we indicated that the supply of futures contracts, although increasing, was not increasing nearly as rapidly as the demand. Taken together, all of these factors brought together a significant risk that SVXY's own trading, along with the other products that were proliferating in this particular investment space at the time, could bring about the sort of liquidity gap that ultimately ended up devastating the investments made by our clients. If your honors have questions, I'm happy to address those as to the district court's ruling and any other issues in the case. I'm Judge LaValle, and I'm reading the passage that you referred to. First of all, it's preceded by a segment that says, ìFinancial instruments cannot always be liquidated at the desired price. It is difficult to execute a trade at a specific price when there is a relatively small volume of buy and sell orders in a market.î Then, a little bit later, it goes on with the passage you were referring to, and I continue, ìThe large size of the positions which the fund may acquire increases the risk of illiquidity by both making their positions more difficult to liquidate and increasing the losses.î I don't understand why you say that. It seems to me clearly to talk about the funds need to purchase these instruments, purchase or sell the instruments, as being the the price to increase because of illiquidity in the market. The fund has a need to buy and sell large amounts of instruments in relation to the size of the market, and this causes illiquidity and causes the price of what they need to buy or sell to change. Why isn't that exactly what you're saying was not warned of? I think that the term ìrisk of illiquidityî doesn't say specifically whether it's referring to the risk of causing illiquidity or the risk that occurs in the event that a market is illiquid. It's talking about the need of the fund to buy more instruments than are readily available in the market. In other words, that the funds need to acquire these instruments is going to cause illiquidity and cause prices to rise because of the funds need to acquire the shares. It seems to me to be addressing exactly what you're saying was not addressed. Well, I appreciate that it's definitely talking about the transactions that will be undertaken by the funds, but what it doesn't say is that due to the size of the funds and their growth and the diminishing in comparison to the size of the funds, the point I'm trying to make is that the term ìrisk of illiquidityî doesn't specify that it's talking about the ability of the funds own trades to cause the market to become illiquid. If the market was already illiquid, then these are the results that we would expect that the positions will be more difficult to liquidate and that losses would be increased while trying to do so. That's entirely consistent with a pre-existing illiquid market. It doesn't say that the funds own trading can actually bring about that market illiquidity and so that's the distinction that we're trying to make and that's consistent with the sentence that immediately precedes the one that we're talking about where it says market illiquidity may cause losses for the funds. It doesn't say the funds may cause market illiquidity. It's the reverse and I think that that sentence should inform how this court reads the sentence that follows it. Similarly, the heading of the section says possible illiquid markets may exacerbate losses. That's clearly, again, a reference to the effects that an illiquid market will have, not the ability of the funds trades based upon its size and the supply of futures contracts to cause that illiquidity in the first instance. I've asked my questions. All right. Judge Raji? I have no questions, thank you. And I have none yet. Counselor, these are three minutes for rebuttal but we'll hear now from Mr. Skinner. Thank you, your honor. Robert Skinner for the brochure's defendants. Let me start by reminding the court that here the fund met its investment objectives at all times and the plaintiffs don't allege otherwise. On February 5th, 2018, the benchmark index nearly doubled in value as market prices fell and volatility expectations spiked. By its design and as disclosed, the fund experienced a corresponding drop in value that day. The risk of this very statement, this is joint appendix 298, quote, a single day or intraday increase in the level of the fund's benchmark approaching 100% could result in the total loss or almost total loss of an investor's investment, end quote. Again, the plaintiffs don't allege that the fund failed to meet its daily investment objectives against the daily movement of its benchmark index, nor could they. Instead, as counsel has said, the grovement of the complaint, as the district court correctly described in this opinion, is that the registration statement failed to disclose the risk of the fund's own conduct that it could drive up the level of the index and thus drive down the value of the fund's shares. The district court's opinion correctly rejected this theory and the complaint's various restatements of the same theory because the registration statement adequately warns investors of the risks alleged in the omission. Now, in reaching this conclusion, the district court correctly applied the pleading standard for materiality of an alleged omission, whether a reasonable investor would view the omitted fact as significantly altering the total mix of information made available in making a decision to purchase the security. As Judge Cote held, reading the registration statement cover to cover, the disclosures and representations taken together and in context could not have misled a nature of the S-VIXI fund and the risks associated with it. In particular, the registration statement describes the risk that the fund's large and concentrated holdings, which are subject to rebalancing every day in an otherwise concentrated market for the VIX futures contracts that it holds, can increase the fund's losses because of illiquidity. Now, according to plaintiffs, as counsel has just argued, these disclosures are a half-truth because they explain only the effects of market illiquidity upon the fund, but not the effect that the fund might have upon the market in times of illiquidity, which in turn also affects the index in the fund. But this distinction between effects and cause that plaintiff attempts to draw here is both inaccurate and simply of no legal relevance. As Judge LaValle's question, property anticipates, given the total mix of information, there are no missing words here, much less a material omission. At bottom, plaintiffs argue at most that the registration statement did not adequately detail the specific mechanism by which the fund's own conduct could affect the value of its shares, but they offer no authority or even logic as to why that allegedly missing detail amounts to a material omission given the total mix of information. That total mix includes an explanation that the fund invests substantially all of its assets in the VIX futures contracts, Joint Appendix 300, and it includes that those holdings are subject to rebalancing every day in order to maintain the correlation with the index, Joint Appendix 298 and 316. It includes disclosure that illiquidity in the market for those VIX futures contracts can negatively affect their price and that market illiquidity may cause losses for the funds, Joint Appendix 301. It explains that the impact of illiquidity could be increased by the fact that the benchmark index for the funds is also concentrated solely in VIX futures contracts. That is, both the fund and its benchmark index are invested essentially entirely in the same VIX futures contracts, as disclosed. And now turning to the language that counsel and Judge LaValle were discussing, specifically regarding the impact of the fund's own conduct, in the section entitled possible illiquid markets may exacerbate losses, it is disclosed that, quote, the large size of the positions which the funds may acquire increases the risk of illiquidity by both making their positions more difficult to liquidate and increasing the losses incurred while trying to do so. This risk disclosure states unequivocally that the fund's own large positions, which are subject to rebalancing every day, can increase the fund's own losses because of illiquidity. The next sentence in the same section goes on to warn that illiquidity will potentially be exacerbated due to the fact that the fund will typically invest only in the instruments that are its underlying benchmark, which in many cases is highly concentrated. In other words, the negative effect on prices due to the fund's large positions could be exacerbated by the fact that it is buying concentrated positions in a concentrated market for the VIX futures contracts. Now, with all of that in the total mix, the disclosure did not need to also say our trades could affect the market contracts, as plaintiffs insist it should have. The disclosure already says the large size of the fund's holdings in a concentrated illiquid market could increase the fund's losses, and self-evidently the only way that could happen is if those large holdings affect the market price of the contracts, since the price of those contracts is the sole driver of the fund's value. After all, those contracts are the fund's only holding and the index's only holding. Now, plaintiffs insist investors required a more detailed description of the mechanism by which the fund's large holdings could affect the fund's losses, but this additional detail would simply not be material to the reasonable investor when these disclosures otherwise make clear that illiquidity in the futures market can negatively affect the fund's value and that its large and large holdings in futures contracts can exacerbate those losses. As the district court correctly held, these disclosures would lead a reasonable investor to know that the fund's own conduct in purchasing and selling the VIX futures contracts could affect market liquidity and drive down the value of S60 shares. The plaintiff's other attempts to show a material omission are also referring to allegations regarding the size and growth in the market. Plaintiffs suggest that investors were not told that the market inventory of VIX futures contracts did not grow fast enough to keep pace with the growing demand for the contracts, creating the so-called liquidity gap. Even assuming the truth of this supposed mismatch in supply and demand for purposes of this motion, here again this is not a material omission given the total mix of information. Investors were told that the market for contracts could be illiquid and that the fund's large positions in a concentrated market could worsen the negative effect of that illiquidity. The additional detail the plaintiffs suggest is missing about the underlying microeconomic cause of the illiquidity, that is the relative growth in demand and the lack of supply keeping up, would not alter the total mix for investors about what the risk was and what could happen to its investments. Moreover, the precedent is clear in this circuit that once the nature of a given risk is disclosed, the issuer does not have a duty in a registration statement to provide real-time updates about the magnitude of that risk as day-to-day market conditions evolve. That is not what a registration is for, registration statement is for, and the law is clear there. Finally, I'll note, Your Honors, that having found that the complaint failed to allege material misrepresentation or omission, which dooms both the 33 and 34 Act claims, the District Court did not address the alternative basis for dismissal that we briefed below, that is lack of plausible sanctuary allegations for the 34 Act claims and the lack of standing through traceability for the 33 Act claims. These are independently sufficient alternative basis for affirming the dismissal and we will stand on our questions about them. With that, I will stop and I welcome your questions. I'm kind of puzzled by something. As I understand it, this fund, by the nature of its purpose, is restricted to investing in contracts which are at the start illiquid in the sense that there is no very great market for the trading in them. If that's true, it seems to me that the potential success of the fund is virtually the success of the fund in the sense that the public decides or large numbers that it's a good idea to buy shares in this fund because you can make money in it. If that happens, if word gets around that some investors have done very well in this fund, that virtually guarantees the bankrupting of the fund because as money flows into the fund, the fund will have a need on a daily basis to acquire large numbers of contracts simply for the purpose of reflecting the market of an index fund for the benefit of all the additional shareholders and that by itself will cause tremendous illiquidity, will cause the contracts to be more and more expensive to acquire and simply keeping up with the demand for the fund will cause the fund to lose all its assets. In other words, on one view of what one needs to disclose in the prospectus, the prospectus should have said, you got to be nuts to invest in this fund because if the fund does well in terms of attracting a large number of investors, that means the fund will lose all its money. Am I wrong? Explain to me why I'm wrong. Respectfully, yes, your honor, that is an incorrect premise, which is that there is a discrete and capped number of futures contracts available. In reality, the supply of futures contracts grows to meet the demand. Now, plaintiffs have alleged, and we don't fight this factually for purposes of this motion, that in this instance, in this period, the supply did not grow enough to keep up with demand, but as a matter of public record, as set forth in our brief, the fact is because the total quantity of these futures contracts is published daily by the Chicago Board of Options Exchange, the CBOE on its website, this is a matter of public record, the size and number of these futures contracts is neither capped nor limited and has grown dramatically over the last several years, along with the growth of these volatility-based products. So, while we are cognizant of the need to accept as true the plaintiff's factual assertions that in this case, supply did not keep up with demand, it is not a correct premise that there is a ceiling because these contracts are financial instruments, and as the underlying volatility related products grow in popularity and size, the futures contracts created by market makers and market counterparties reflected on the Chicago Board of Options Exchange has grown dramatically, and we would say, as a factual matter, has kept up just fine, which is why this product continues and has success in meeting its daily investment objective of matching the inverse of the index. Okay. Those are my questions. Judge Raji. I have no questions. Thank you. All right. Plaintiff's counsel has reserved three minutes. Go ahead. Use your three minutes, and I'll have a question for you. Thank you, Your Honor. Well, Your Honors, I guess a point I perhaps could have made earlier is that the defendants have actually cited in their brief a series of cases involving Credit Suisse with a similar fund. It's the Set Capital, Rubenstein, and Weigard cases that they cited in their brief, and in that instance, it wasn't a fund. It was debt instruments, and Credit Suisse in those cases disclosed that the hedging activity that it was undertaking in as a result of any sort of diminution in volatility, it disclosed that the hedging activity may adversely affect the level of the underlying index and, as a consequence, the market value of the notes and the amount payable at maturity. That's a quote from Set Capital. I don't dispute that the registration statement here disclosed that there could be losses when markets became illiquid, but what it doesn't disclose is that the trading undertaken by the fund itself could actually bring about that illiquidity and then even further than that begin this sort of feedback loop that results in a death spiral where 90% of the value of the interest held by our clients was devastated in a single day. It's not that it's something that's out of the ordinary or illogical. It's in fact exactly what the Credit Suisse disclosures did, and in those cases, the plaintiffs had argued that you had to say that those losses were inevitable and courts had disagreed with that, but the bottom line is that the very type of disclosure that we're suggesting needs to have been made here was in fact made in those cases, and so I think that strongly suggests that there is an issue here with respect to the actual disclosures themselves. Again, I know that Judge LaValle and I have gone around and around on page 135 of the that the fund's trades themselves can actually bring about the illiquidity that will have the ill effects that are disclosed in that particular disclosure, and in fact, that's what the heading says and that's what the topic sentence to the paragraph that contains the sentence that Judge LaValle and I discussed. So I think based on all of that, I would submit that in fact, the disclosure was incomplete and was misleading, and at this pleading stage, where materiality issues are favorably looked upon for plaintiffs, that this court should reverse. Your Honor, I understand you have a question for me? I do, I do. A very simple one and uncomplicated one, I guess. In Twombly, the Supreme Court used what has become a famous phrase, um, nudging your claims across the line from conceivable to plausible. Now, you think or you claim that you have in fact nudged your claims across the line from conceivable to plausible, right? Yes, Your Honor. Let me ask you what it is that you would want from us in these circumstances. Let us assume for the argument that we find your argument compelling, successful enough, what is this court's action in those circumstances? We would remand presumably for discovery, is that right? Well, Your Honor, as opposing counsel indicated, there are a number of issues that were left unresolved in the motion to dismiss that was briefed in this appeal. Obviously, this court has discretion to choose to consider those or not, but assuming that the court chose not to address those, then I think that the proper procedure at this point would be to reverse and then remand for further proceedings consistent with this order, and that presumably would involve addressing the other issues that the defendants have raised with respect to a motion to dismiss. Indeed, because this is an issue that touches on materiality, that's in fact an appropriate step here because this is a mixed question of fact and law that's typically one for the jury, and it's not a situation where it's so obviously unimportant to a reasonable investor that reasonable minds could not differ. So walk me through this court proceeding on remand. With respect, let's just stick to the particular claim that is clearly before us. What is it that you would seek to do in the district court upon remand? I mean, the best you can hope for, I assume, is vacater, not reversal, right? So you have a vacater of the judgment. What then? What is the discovery that you're seeking? How would you get it? Well, your honor, number one, I believe that the defendants would insist on resolving the rest of their motion to dismiss issues. With respect to the discovery, obviously we've got very limited information on how this fund functioned, exactly what it was that transpired on the date that our clients lost 90% of the value of their investments. Because this is a securities case, we haven't had any discovery thus far, and basically we'd be starting from square one to get to the bottom of what should have been disclosed and what actually transpired during the actual meltdown. Okay. Well, thank you. Judge LaValle or Judge Raji, any other questions for plaintiff's counsel? Not for me, thank you. No, thank you. Thank you very much. We'll reserve decision.